UNITED STATES DISTRICT COURT

| | |
|---|---|
| J.W. o/b/o E.W. | |
| Plaintiff, | DISTRICT OF NEW JERSEY |
| v. | Civil Action:  2:26-cv-03678-KSH-AME |
| Livingston Board of Education | |
| Defendant. | **FIRST AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff J.W., on behalf of E.W. (collectively, "Plaintiff"), by and through counsel, Rue Law Group, LLC, alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is a civil-rights action under 42 U.S.C. § 1983 arising from Defendant's adjudication and maintenance of an academic-dishonesty accusation against E.W., a public high school student, without constitutionally adequate process.

2.      This case is not a routine grading disagreement. Defendant treated a disputed academic issue as a misconduct charge carrying stigmatizing, disciplinary, and educational consequences, while failing to provide the basic procedural protections required before imposing or maintaining that result.

3.      Defendant failed to provide advance written notice of the specific charge, failed to disclose the evidence it intended to rely upon in a meaningful way, failed to provide a neutral and meaningful opportunity to respond, failed to issue written findings grounded in disclosed evidence, and failed to provide any meaningful appeal.

4.      Defendant changed E.W.'s examination grade to zero on two separate occasions — first on January 23, 2026, at the direction of an assistant principal and before any meeting with E.W. or his parents, and again following a February 2, 2026 meeting after Plaintiff challenged the accusation and sought review — thereby converting the purported review process into the ratification and re-imposition of a predetermined result.

5.      The consequences of Defendant's determination extended well beyond a single grade. Among other things, E.W. was removed from the Mu Alpha Theta mathematics honor society without notice or explanation; under Defendant's own policies an academic-integrity finding is documented and retained for the duration of a student's school career and may carry additional disciplinary and extracurricular consequences; and, following a pattern of heightened scrutiny that culminated days after this action was filed, E.W.'s family concluded that continued enrollment was no longer

viable and withdrew him, with the result that E.W. lost the 2025–2026 academic year and must repeat the tenth grade.

6. Plaintiff seeks declaratory and injunctive relief, including expungement of the academic-dishonesty determination and related records; nominal damages; compensatory damages to the extent available under law; attorneys' fees and costs; and such other relief as the Court deems just and proper.

## PARTIES

7. Plaintiff E.W. is a minor who, at all relevant times, was enrolled in the Livingston Public School District and attended Livingston High School in New Jersey.

8. Plaintiff J.W. is E.W.'s parent and legal guardian and brings this action on E.W.'s behalf.

**9.** Defendant Livingston Board of Education is the local governmental entity that governs the Livingston Public School District, organized under the laws of New Jersey, and at all relevant times acted under color of state law.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

11.     This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202.

12.     This Court has authority to award attorneys' fees and costs under 42 U.S.C. § 1988.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

*The examination and the initial grade*

14.     On or about January 5, 2026, E.W. took an AP Pre-Calculus Unit 4 examination administered by his teacher, Daniel Brill, at Livingston High School.

15.     E.W. completed the examination during the testing period and reviewed his answers near the end of the period.

16.     Near the end of the examination, E.W.'s mechanical pencil had very little lead remaining, making his markings lighter than earlier portions of the

test, and his eraser was substantially depleted, leaving him unable to fully erase certain answer selections. To correct several multiple-choice answers, E.W. crossed out his original selections and circled new ones, marking lightly. All such markings were made during the testing period, before the examination was submitted.

17.     On or about January 20, 2026, E.W. observed through the school portal that he had received a score of 63 on the examination.

18.     On or about January 21, 2026, E.W. met with Mr. Brill and raised concerns that multiple questions had been graded incorrectly.

### *The first change of the grade to zero (January 23, 2026)*

19.     On January 22, 2026, E.W.'s parent emailed Mr. Brill, explaining the circumstances and asking whether E.W. could retake the examination to demonstrate his understanding of the material.

20.     On January 23, 2026, Mr. Brill replied by email that the matter "appears to be a clear case of a breach of academic integrity" and stated that, "[a]s directed by Mrs. Battist-Rock" — the assistant principal — "a zero has been put in the gradebook for his Unit 4 Assessment."

21.     Mr. Brill thereby changed E.W.'s examination score from 63 to zero on January 23, 2026 — before any meeting with E.W. or his parents, before

any disclosure of the evidence, and before any opportunity to be heard before a neutral decisionmaker.

22.     That same day, E.W.'s parent responded in writing, disputing the accusation, asking on what facts the school had concluded this was a "clear case," requesting an investigation of the facts and evidence rather than speculation, and identifying classmates who could confirm that E.W. did not alter his answers after the examination was returned.

### The informal meeting and partial restoration (January 28, 2026)

23.     On January 28, 2026, E.W.'s parents met informally with Assistant Principal Marie Battist-Rock and Mr. Brill. Following that meeting, E.W.'s score was changed from zero back to 63 — reflecting the portion of the examination not affected by the academic-dishonesty accusation — and E.W.'s parents informed school officials that they intended to appeal the academic-dishonesty finding.

24.     On or about January 27, 2026, a school counselor advised the family in writing that, as a counselor, she was "really not involved in the disciplinary process" and that "[t]hose decisions are made by the administration."

25.    In a written follow-up on the afternoon of January 28, 2026, Assistant Principal Battist-Rock advised that, "if you are looking to formally appeal, please reach out directly to our building principal, Mr. Mohammed."

*Heightened scrutiny following the family's challenge*

26.    Beginning the same day as the January 28, 2026 meeting and continuing thereafter, E.W. was subjected to heightened scrutiny by Mr. Brill that had not been present before the family challenged the accusation.

27.    On the afternoon of January 28, 2026 — hours after the morning meeting — Mr. Brill reported to the administration that E.W. had had his in-class assessment "in hand while talking with another student." Upon information and belief, the other student talking with E.W. was also holding an assessment at the time and was not similarly reported or escalated to the administration or to that student's family.

28.    On January 29, 2026, Mr. Brill directed E.W. to place his lunch box on the floor, stating a concern that E.W. might scratch his paper, although E.W. had routinely placed his lunch box on his desk in that class without objection before the dispute.

29.    Also on January 29, 2026, Mr. Brill made remarks to the class that, without naming E.W., referenced the specific circumstances of E.W.'s examination dispute, including statements to the effect of "run out of lead,"

"no eraser," "circle lightly," "five minutes after I gave it back," and "you could have absolutely done something with it."

### *The request for review by the principal (January 29, 2026)*

30.     On January 29, 2026, E.W.'s parents emailed Principal Amro Mohammed requesting a meeting, explaining that E.W. had been accused of academic dishonesty without evidence and without due process, that the accusation rested on subjective judgments rather than evidence, and that the school had rejected their requests for an objective investigation, a retake of the examination, and interviews of classmates who could corroborate E.W.'s account. They requested a meeting with E.W. present, an opportunity to review the original examination, and an objective review of the evidence before any determination was made.

### *The February 2 meeting and re-imposition of the zero*

31.     On February 2, 2026, E.W. and his parents met with Principal Mohammed, Mr. Brill, and a guidance counselor.

32.     At that meeting, school officials stated, in substance, that they believed E.W. had cheated because they found it improbable that the teacher had made multiple grading errors, and Principal Mohammed stated that he had seen students engage in such conduct "a lot" and that, in his judgment, the matter constituted a breach of academic integrity.

33.    E.W. explained that the lighter markings resulted from depleted pencil lead and that he had made the disputed changes during the testing period. His parents asked the school to consider the timing of events, the presence of classmates who could corroborate his account, and the possibility of a forensic examination of the document, and again requested a retake.

34.    School officials rejected a retake, declined to reconsider the accusation in any meaningful way, and indicated that the determination would stand based principally on administrative experience and the asserted improbability of grading error.

35.    Following the February 2, 2026 meeting, Principal Mohammed directed that E.W.'s grade be reduced to zero again — the second such reduction — rather than restoring the posted grade or providing a fair process to determine what had actually occurred.

36.    The February 2, 2026 meeting was the principal in-person proceeding at which Plaintiff was permitted to respond before Defendant finalized and maintained the misconduct determination and the zero grade. Before and during that proceeding, Defendant did not provide advance written notice identifying the specific charge, advance disclosure of the evidence to be relied upon, a neutral fact-finding process, written findings grounded in disclosed evidence, or any meaningful internal appeal.

*Removal from the mathematics honor society (February 6, 2026)*

37. On or about May 20, 2025, E.W. was inducted into the Mu Alpha Theta mathematics honor society at Livingston High School.

38. On or about February 6, 2026 — days after the February 2 meeting — E.W. observed that his Mu Alpha Theta membership no longer appeared in his Schoology portal, while the honor-society group remained active on the portals of other students. E.W. received no oral or written notice or explanation for the removal and has been unable to receive announcements or participate in honor-society activities since.

39. Defendant provided no notice, statement of reasons, or opportunity to be heard concerning the removal of E.W. from the honor society. Under Defendant's own policies, an academic-integrity violation may result in removal or suspension from academic honor societies, and an Unsatisfactory Citizenship marker — itself a consequence of such a violation — may affect a student's eligibility for honor societies. Upon information and belief, and consistent with those policies, the removal followed from, and was a consequence of, the academic-dishonesty determination.

*Defendant's policies regarding consequences and appeals*

40. Defendant's Livingston High School Student Handbook provides that a violation of the Academic Integrity Code will result in, among other things: documentation of the incident; a report of the violation to the

student's parent and assistant principal; no credit for the assignment; a one-day Saturday detention; potential suspension or removal from athletic or extracurricular activities; "[d]eferment/exclusion of application for, or removal/suspension from, academic honor societies"; an "Unsatisfactory Citizenship (UC) marker" on the report card; and retention of "this information . . . for the duration of the student's career."

41.    Under Defendant's policies, the consequences of an academic-integrity determination are not limited to the school in which it is imposed. Defendant's Policy 5600 provides that, when a student transfers to another New Jersey public school district, the student's records relating to disciplinary actions are disclosed to the receiving district, in accordance with N.J.A.C. 6A:16-7.9 and N.J.S.A. 18A:36-19(a). Because Defendant treated this matter as a disciplinary matter — routing it through the disciplinary track and denying any appeal on that basis — the academic-dishonesty determination and related records create a continuing risk that the finding will be disclosed to, and carry adverse consequences within, any New Jersey public school E.W. later attends. Separately, many colleges and universities require applicants, through their application materials, to disclose whether they have ever been found responsible, since the ninth grade, for a disciplinary violation — including one based on academic misconduct —

that resulted in a disciplinary action, and to explain the circumstances; Harvard College's first-year application supplement, for example, requires precisely that disclosure. Because Defendant found E.W. responsible for academic misconduct and imposed disciplinary consequences during his sophomore year, E.W. will face the obligation to disclose and explain this disputed determination in such applications, regardless of whether Defendant itself transmits the finding. That compelled disclosure of a contested and stigmatizing finding is itself a continuing and concrete harm.

42. In a February 25, 2026 letter, District counsel addressed the chronology of the grade changes and stated that E.W.'s grade on the examination would remain a zero as a result of the determination of academic dishonesty.

43. Plaintiff disputes any characterization, including in counsel's February 25, 2026 correspondence, suggesting that E.W.'s parents concurred in a determination of academic dishonesty. Plaintiff did not agree with that determination, objected to it at the time, and communicated an intent to appeal.

44. In a March 2, 2026 email, District counsel stated that "the District does not offer appeals beyond the building level determinations for

allegations of academic dishonesty" and that "[t]he determination of the Building Principal in this matter is final."

45. Because the Building Principal's determination is final and not subject to further internal review, that decision constitutes the act of a final policymaker for purposes of municipal liability under § 1983.

46. Defendant's Policy 5600, "Student Discipline/Code of Conduct," provides that "[t]he Building Principal or designee shall have the authority to assign discipline to students," and Defendant's policies provide that, with limited exceptions, there is no appeal process for discipline. By contrast, Defendant's Student Handbook sets out a separate procedure for questions regarding grades, under which a student may meet with the teacher, then meet with the teacher and the department supervisor, who mediates the dispute, and may then appeal to the principal or designee, who reviews the matter with all parties and renders a decision. Defendant did not afford E.W. that grade-review procedure; by treating the disputed examination as a charge of academic dishonesty rather than a grade dispute, Defendant routed the matter into the disciplinary track that, by Defendant's own account, provides no appeal, bypassing the department-supervisor mediation and principal review the grade-review procedure would otherwise have provided.

*The second academic-integrity accusation (March 23, 2026)*

47. On March 23, 2026, while the examination dispute remained unresolved, E.W. was the subject of a separate academic-integrity matter concerning a chemistry lab assignment, which the teacher documented as an academic-integrity violation and for which E.W. received a grade penalty. Plaintiff does not base any claim in this action on that matter; it is referenced only because the resulting second academic-integrity entry, weeks after the examination accusation, added to the accumulating consequences E.W. faced and to the circumstances that led to his withdrawal.

*Continued scrutiny, the April 9 incident, and withdrawal*

48. Following the dispute, E.W. experienced continued differential treatment by Mr. Brill, including having to repeat questions multiple times before receiving a response where previously he had received responses promptly. Over time, E.W. stopped asking questions in class.

49. On April 7, 2026, Plaintiff filed the original Complaint in this action.

50. On April 9, 2026 — during the first session of Mr. Brill's class after the Complaint was filed — Mr. Brill called E.W. back to the classroom after class and stated that he believed he had seen E.W. take something from his pocket and use it to scratch or alter his folder, and questioned whether E.W. had altered his test. E.W. denied doing so and showed the contents of his

pocket, which contained only a student identification card. No eraser or other item was found, and Mr. Brill did not pursue the matter, stating that he would let E.W. go.

51. Following the April 9, 2026 incident, and in light of the accumulated accusations and the pattern of heightened scrutiny, E.W.'s family concluded that continued enrollment at Livingston High School was no longer viable.

52. E.W. ceased attending Livingston High School and began home instruction on or about April 10, 2026. By letter dated April 13, 2026, counsel notified District counsel of the family's decision to withdraw E.W. and of the family's concern that E.W. had been subjected to retaliatory treatment after the family challenged the academic-dishonesty determination. On or about April 22, 2026, J.W. executed Defendant's Transfer/Withdrawal form, stating the reason as the family's determination that continued enrollment at Livingston High School was no longer viable.

53. By email dated April 29, 2026, a District official confirmed that, because E.W. was not completing the school year, his Livingston High School transcript would "not include any courses/credits for the classes that he has not completed," and that credit is not issued until a course is completed. Although E.W. received grades for the first semester, the school

E.W. will attend will not accept partial-year credit; as a result, E.W. has lost the entire 2025–2026 academic year and must repeat the tenth grade.

*Injury*

54.    As a direct and proximate result of Defendant's conduct, E.W. has suffered and continues to suffer harm, including a stigmatizing academic-dishonesty determination maintained on Defendant's records, which under Defendant's policies will be disclosed to a receiving New Jersey public school district upon transfer and which E.W. may be required to self-report in college and program applications; removal from the Mu Alpha Theta honor society; the loss of the 2025–2026 academic year and the need to repeat the tenth grade; damage to his reputation within the school community; interference with academic honors and recognitions; and emotional distress. *See Goss v. Lopez*, 419 U.S. 565 (1975); *Paul v. Davis*, 424 U.S. 693 (1976); *Codd v. Velger*, 429 U.S. 624 (1977).

### COUNT ONE
### 42 U.S.C. § 1983 — Denial of Procedural Due Process

55.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

56.    Defendant acted under color of state law.

57.    Public school students possess protected property and liberty interests that cannot be deprived without constitutionally adequate procedure,

including interests implicated by stigmatizing misconduct findings accompanied by tangible educational and reputational harm. *See Goss v. Lopez*, 419 U.S. 565 (1975); *Paul v. Davis*, 424 U.S. 693 (1976); *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006).

58.    Defendant deprived E.W. of protected interests by imposing and maintaining a stigmatizing academic-dishonesty determination — together with the re-imposition of a zero grade, removal from the mathematics honor society, and a record retained for the duration of his school career — without constitutionally sufficient process.

59.    Defendant did so without adequate written notice of the precise charge, without timely disclosure of the evidence relied upon, without a fair and meaningful opportunity to rebut the accusation before a neutral decisionmaker, without written factual findings, and without any meaningful appeal.

60.    The January 23, 2026 imposition of a zero, before any meeting, reflects that the determination was predetermined; and the February 2, 2026 meeting did not cure the procedural defects because Defendant's decisionmakers had already accepted the accusation, relied on generalized assumptions rather than a fair evidentiary process, and rejected Plaintiff's requests for meaningful review.

61. E.W. disputes the truth of the academic-dishonesty charge, and Defendant has afforded no process by which he may clear his name.

62. As a direct and proximate result of the denial of procedural due process, Plaintiff has suffered injury and is entitled to declaratory relief, injunctive relief including expungement, nominal damages, and compensatory damages to the extent permitted by law. *See Carey v. Piphus*, 435 U.S. 247 (1978).

**COUNT TWO**
**42 U.S.C. § 1983 — Municipal Liability**

63. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

64. A local governmental entity is liable under 42 U.S.C. § 1983 when a constitutional violation is caused by an official policy, custom, or practice, or by a decision of an official with final policymaking authority. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

65. By Defendant's own policy and the representations of its counsel, the Building Principal's determination of academic dishonesty is final and not subject to appeal beyond the building level. The challenged deprivation was therefore caused by the decision of an official vested with final policymaking authority over the academic-integrity determination and resulting consequences.

66. Additionally or alternatively, the deprivation was caused by Defendant's policies, customs, or practices that permit administrators to impose and maintain academic-integrity findings and resulting consequences without advance written notice, disclosure of the supporting evidence, written findings, or any meaningful appeal — as reflected in Policy 5600 and the Student Handbook, and in Defendant's handling of the January 2026 mathematics accusation, in which the determination was made and the zero imposed before any meeting with E.W. or his parents.

67. Defendant further failed to adequately train and supervise its administrators concerning the procedures constitutionally required when a grading dispute is converted into a charge of student misconduct carrying stigmatizing and educational consequences.

68. These policies, customs, practices, decisions, and failures to train and supervise were the moving force behind the deprivations of Plaintiff's federal rights alleged in each count of this Complaint, including the First Amendment retaliation alleged in Count Three.

## COUNT THREE
### 42 U.S.C. § 1983 — First Amendment Retaliation

69. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

70.     Plaintiff engaged in constitutionally protected activity by disputing the accusation, objecting to the academic-dishonesty determination, requesting an investigation and review, requesting a written decision, seeking a meeting with the principal, and filing this action.

71.     Defendant took adverse actions that would deter a person of ordinary firmness from exercising those rights, including re-imposing a zero on the examination after Plaintiff challenged the accusation; subjecting E.W. to a pattern of heightened scrutiny beginning hours after the January 28, 2026 meeting and continuing thereafter; and confronting E.W. with a renewed accusation of altering his test on April 9, 2026 — the first class session after this action was filed.

72.     The close temporal proximity between Plaintiff's protected activity and the adverse actions — including the re-imposition of the zero immediately after the challenge, the heightened scrutiny beginning the day of the January 28 meeting, and the April 9 confrontation two days after the Complaint was filed — together with Defendant's statements and conduct, supports the inference that Plaintiff's protected activity was a substantial or motivating factor in the adverse actions. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).

73.     Defendant is liable for the retaliation alleged in this Count. The retaliatory adverse actions were not the isolated conduct of a single teacher; they were directed and ratified within Defendant's administration. The original zero was entered at the direction of Assistant Principal Battist-Rock, and Principal Mohammed — Defendant's final policymaker for academic-integrity determinations — re-imposed the zero after Plaintiff's protected activity and declared the determination final and not subject to appeal. Mr. Brill's reporting concerning E.W. was likewise made to, and acted upon within, the administration rather than handled by Mr. Brill alone. In addition, after counsel's April 13, 2026 letter placed Defendant on notice of the family's concern that E.W. was being subjected to retaliatory treatment, and before J.W. executed Defendant's Transfer/Withdrawal form on or about April 22, 2026, Defendant took no action to address that concern — such as reassigning E.W. out of Mr. Brill's class or making another arrangement that might have allowed E.W. to remain enrolled — despite having both notice and an opportunity to act before the withdrawal was executed. The retaliation was therefore caused by Defendant's final policymakers and by Defendant's failure to act on known concerns, and not by the isolated act of a single employee.

74. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered injury and is entitled to all available relief.

## COUNT FOUR
### Declaratory Relief

75. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

76. An actual and justiciable controversy exists concerning whether Defendant's procedures and determination violated Plaintiff's rights under the Fourteenth and First Amendments and 42 U.S.C. § 1983.

77. Plaintiff is entitled to a declaration that Defendant's challenged conduct and procedures were unlawful.

## COUNT FIVE
### Injunctive Relief

78. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

79. Plaintiff has suffered and will continue to suffer irreparable harm absent injunctive relief, including the ongoing maintenance of a stigmatizing academic-dishonesty determination and related records that, under Defendant's own policies, may follow E.W. to any New Jersey public school he later attends and that he may be required to disclose in future educational

applications, together with the honor-society removal and the loss of an academic year, which cannot be fully remedied by money damages alone.

80. The balance of equities favors Plaintiff because the requested relief would require only constitutionally adequate procedures and the correction of unlawful record consequences.

81. The public interest favors injunctive relief because public schools must provide fundamentally fair procedures before imposing stigmatizing misconduct findings and tangible educational penalties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

A. A declaration that Defendant's acts, omissions, policies, practices, and procedures, as alleged herein, violated Plaintiff's rights under the Fourteenth and First Amendments and 42 U.S.C. § 1983.

B. Permanent injunctive relief requiring Defendant to vacate the challenged academic-dishonesty determination unless and until Defendant affords constitutionally adequate procedures.

C. Permanent injunctive relief requiring Defendant to expunge, remove, or correct any academic-dishonesty notation, misconduct notation, honor-society removal, or related adverse educational-record entry

arising from the challenged determination, and to correct E.W.'s records accordingly.

D. To the extent E.W. seeks to resume enrollment in the District, injunctive relief requiring Defendant to restore E.W.'s academic standing, honors eligibility, and related educational status affected by the challenged determination, or to provide a new determination through constitutionally adequate procedures.

E. Compensatory damages to the extent permitted by law.

F. Nominal damages.

G. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

H. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


RUE LAW GROUP, LLC
Attorneys for Plaintiff

_____

By: /s/ John Rue
John Rue, Esq. (ID #047032005)
Krista Rue, Esq. (ID #041482002)
5 Lake Drive, Woodland Lakes
Randolph, NJ 07869
(862) 283-3155
john@johnruelaw.com
Dated: June __, 2026